[Crim. No. 3966.   Second Dist., Div. One.   Apr. 12, 1946.]

THE PEOPLE, Respondent, v. JULIUS FELIX HERMES, Appellant.

Gladys Towles Root for Appellant.

Robert W. Kenny, Attorney General, and L. G. Campbell, Deputy Attorney General, for Respondent.

WHITE, J.—This prosecution was instituted through the filing of an information by the district attorney of Los Angeles County wherein the defendant was charged in count I with the crime of burglary, in that on the 3d of June, 1945, he wilfully entered a building occupied by the prosecuting witness with intent then and there to commit the crime of rape. By count II the defendant was accused of committing the crime of rape upon the prosecuting witness, who was then of the age of 17 years and not his wife. It was also charged in each count that the defendant had theretofore been convicted in the Superior Court of Los Angeles County of the crimes of burglary and attempt to commit rape.

To both counts of the information defendant duly entered his pleas of not guilty and a denial of the prior conviction.

Upon proper stipulation, the cause was tried before the court sitting without a jury, resulting in the defendant's conviction of the offense of burglary as charged in count I, which was found to be burglary of the first degree. As to count II, the court found the defendant guilty of an attempt to commit rape, a lesser but necessarily included offense. Concerning the prior conviction charged against the defendant, the court, upon a stipulation of facts, found such allegation to be true. A motion for new trial was denied and judgments pronounced. From the judgments of conviction and from the order denying his motion for a new trial defendant prosecutes this appeal.

The notice of appeal herein sets forth nine grounds upon which it is predicated, including the claims that both the court and district attorney were guilty of misconduct to the prejudice of the defendant. However, in his brief appellant limits his argument for a reversal to three grounds, first, that the court abused its discretion in permitting the prosecution to read into evidence the testimony of the complaining witness given at the preliminary examination on the ground that such witness could not with due diligence be found within the State of California; second, the admission of evidence of other wrongful acts allegedly committed by the defendant; and thirdly, that the judgments are contrary to the law and the evidence. We shall give consideration only to the three just mentioned grounds urged and argued by appellant in his brief. ■ No showing having been made in support of the remaining grounds of appeal, it is not incumbent upon this court to search the record for the purpose of ascertaining whether or not other errors warranting a reversal occurred in the trial of the cause. We have, nevertheless, as is our custom in such cases, examined the record with some care and have failed to find any substantial errors which require consideration by us of any of the grounds of appeal not urged by appellant in his brief. ■ Indeed, the failure of appellant to make any attempt to support the remaining grounds of appeal amounts to a tacit concession that any errors, upon which in the first instance he might have based any hope for a reversal, were without prejudice to his rights. (*People* v. *Buenaflore,* 40 Cal.App.2d 713, 719 [105 P.2d 621]; *People* v. *Fouts,* 61 Cal.App. 242, 245 [214 P. 657]; *People* v. *Buck,* 46 Cal.App.2d 558, 567 [116 P.2d 160].)

The factual background underlying this prosecution may be thus epitomized: About four o'clock on the morning of June 3, 1945, while the complaining witness was asleep in her bed, she awakened and observed a man standing over her; she "smelled a funny odor" and asked the man who he was, to which he replied that he was Earl; that she grabbed a badge he was wearing and screamed; that while the bedroom was dark, some light came in through the windows; that the man had his private parts out and they were against her body. The witness testified that when she screamed the man ran; that she then arose from bed, armed herself with a butcher knife, and ran to a next-door neighbor. The neighbor returned with the complaining witness to her home and the intruder was still there.

The neighbor, Clarence Mitchell, testified to the complaining witness' coming to his home and telling him there was a man in her house; that he accompanied her back to the premises, where the man was standing in the bedroom. Both the complaining witness and Mr. Mitchell identified the defendant as the man in question. Mr. Mitchell testified that he asked the defendant who he was and what made the complaining witness scream and rush out of her house, to which the defendant said, "Must have been somebody, let's call the law." To this the witness Mitchell replied, "I am going to leave that up to her, if she wants to call the law, it is OK and if she don't, it is OK." After some little discussion the defendant left.

Clarence .W. Kissam, one of the investigating police officers, testified that the defendant was arrested on June 3, 1945; that he had a conversation with the defendant concerning the case; that he asked defendant where he was employed and was advised by him that he worked at the shipyards from 7 p. m. until 5:30 a. m. except on Saturdays, when he went to work from 4:30 p. m. to 3 a. m. He asked the defendant whether he wore an identification badge and the latter admitted he did; that the same consisted of a badge with his picture on the front and his signature and fingerprint on the rear thereof. Defendant told the police officer that he had no idea where the badge was at present, but he had used it the preceding night to go to work. He denied ever being in the home of the complaining witness. Subsequently, and after the complaining witness and her neighbor, Mr. Mitchell,

had identified defendant as the man who was in her home, the police officer had a further conversation with the defendant, in which the latter told him that he had been in similar trouble before. "He said he might be walking down the street anywhere and have a sex desire and he was liable to break into a house and commit such an act." The officer asked the defendant, "Was that the same procedure that you followed in the other case that you were involved in when you was serving this time and that you are now on probation for?" to which the defendant replied, "Yes." According to the police officer, the defendant finally stated, that "he had known this woman before, had seen her around, and walked right up to this house, walked into the house and committed the act, and he started to tell us the whole story. He went on about how the moon affected him certain times of the month, that is what changed his feelings on the sex angle, and he told us when the other two officers left—he said, 'I will talk to you later on.' But when later on came around he didn't have anything further to say. He said, 'I don't care to talk any more.'"

In behalf of the defendant a witness, Ben Gollette, testified that he had known the defendant for about two or three years and had worked with him; that on the morning of June 3, he met the defendant accompanied by a young lady; that he stopped and asked the defendant, "Where are you going, Julius?" to which the defendant replied, "I am going home with this girl"; that this was around 3:30 o'clock in the morning.

Testifying in his own behalf, defendant stated that he was employed at Bethlehem Steel Works for about six years; that on the morning in question, after he had alighted from a streetcar, returning home, he saw a girl sitting in the passenger station crying; that he went over and asked her what the trouble was, to which she replied that "she had had a fight with a sailor"; that the girl was intoxicated at the time and asked the defendant to take her home, to which he agreed; that they proceeded toward her home when they encountered the aforesaid witness Gollette; that after this meeting they continued to the girl's house; that the young lady was telling him about her husband being in the army; that she had a couple of children; that she and her husband were separated. Defendant testified that the complaining witness

advised him that she was "kind of broke and that she needed a little help"; that when they entered the house, "why, she kind of propositioned me a little, you know. She asked me— she said, 'Well, is it worth $5.00 to you?' And I kind of— I thought, 'Well, yes,'—I told her, 'I will give you $5.00. I haven't got a lot of money on me this morning.' I had only about $25.00. Then she, all of a sudden, changed her mind and she said, 'If you got $25.00 on you why can't you give me more than $5.00?'" The defendant testified that he refused to give her any more, and suddenly "she jumped up, started to scream and ran out of the house." He testified that he remained in the house until the arrival of the complaining witness' neighbor, Mr. Mitchell, and after some discussion with him, walked away from the premises. The defendant admitted that he remained in the house in an attempt to recover his shipyard badge.

In answer to questions as to why he had made conflicting statements to the police officers, defendant denied telling them that he had not missed his badge until he had arrived at his home. He also denied telling them anything "about the moon" affecting him. He also denied making any statement to the effect that "he might be walking down the street anywhere and have a sex desire and he was liable to break into a house and commit such an act." Defendant also denied telling the officer that he had never been in the home of the complaining witness and stated that he told the officer that he "preferred not to talk about it until I see my lawyer." The defendant testified that he was twenty-five years of age and admitted on cross-examination that he had been previously convicted of burglary and attempted rape.

It was stipulated that if the witness Louise Jackson were present she would testify that on the morning following the alleged occurrence she had a conversation with the complaining witness and that the latter "had liquor on her breath."

With regard to appellant's first contention, namely, that the trial court erred in permitting the testimony given by the complaining witness at the preliminary examination to be read at the trial instead of requiring the presence of such witness, the record discloses that a subpoena was issued for the witness in question and delivered to a member of the Bureau of Investigation of the District Attorney's office, who was assigned as a process server for the department of the

court in which the prosecution was pending. The process server went to the address in Compton where the mother of the prosecuting witness lived, on or about July 9 or 10; he inquired for the witness at the bungalow court where she had formerly lived; he went to every house in the bungalow court, there being eight or nine of them; that he obtained the address of the bungalow court from the transcript of the testimony given by the prosecuting witness at the preliminary hearing; that he did not find her; that subsequently he went to Riverside about the 11th and 12th of July. There he made inquiry at the Riverside Mission Inn and at five or six restaurants on the chance she might be working at one of them because she had been a waitress at the Mission Inn. He checked with the police department and went back to the bungalow court where the prosecuting witness had lived. He talked with a man residing there and was referred by him to another person by the name of Carl as one who might have information concerning the whereabouts of the missing witness. He found Carl, who said he had known the family for many years and knew the prosecuting witness very well. When the process server asked him where the prosecuting witness was, Carl answered, "I haven't seen Betty for two or three weeks." The process server then went to another restaurant in search of the witness and asked a dozen people who were acquainted with her, from each of whom he received the information, "I think she has gone away. I think the shame and humiliation of an open trial in court sort of embarrassed her, and she doesn't want to come back to Compton any more. I haven't seen her for about three weeks." The process server testified that he had worked with the police department in the search and for some ten days preceding the trial had devoted practically all of his time to an attempt to locate the prosecuting witness.

The mother of the prosecuting witness testified that she had contacted everyone whom she thought knew her daughter, in an effort to find her; that she had a telegram from the prosecuting witness dated June 2, 1945, which was the last word she had from her; that she made inquiry of a girl friend of the missing witness; but notwithstanding all of her inquiries she failed to get any clue as to the whereabouts of the witness. The mother testified that she had contacted the police department and vainly sought information con-

cerning her daughter. She further testified that the prosecuting witness was the mother of a baby fifteen months old, then in the custody of the prosecuting witness' mother; that she and her daughter lived together at the Nevada Hotel in Riverside at about the time of the preliminary examination on June 11, 1945; that the prosecuting witness worked at a cafe in Riverside, giving up that position about a week prior to the preliminary examination and returning to Compton; that she remained there only a few days, when she departed; that since that time she had not returned nor had her mother heard anything of or concerning her.

The authority for the procedure adopted by the trial court in permitting the testimony of the absent witness to be read is contained in subdivision 3 of section 686 of the Penal Code. That section, as amended in 1911, has been held not to be repugnant to the Sixth Amendment to the Constitution of the United States, which provides that a defendant in a criminal action is entitled "to be confronted with the witnesses against him," or to section 13, article I, of the Constitution of the State of California. (*People* v. *Schwarz,* 78 Cal.App. 561, 579 [248 P. 990]; *People* v. *Wilson,* 26 Cal.App. 336, 337 [146 P. 1048]; *People* v. *Bernstein,* 70 Cal.App.2d 462, 468 [161 P.2d 381].)

In the instant case but one question was presented for the court's determination under subdivision 3 of section 686 of the Penal Code, and that was whether it was "satisfactorily shown to the court" that the prosecuting witness could not "with due diligence be found within the state." That question is one primarily addressed to the trial judge, to be determined by him from the evidence presented. It is a question of fact, the determination of which by the trial court will not be interfered with unless the appellate court be satisfied that the trier of facts abused the discretion lodged in him in determining that due diligence had been used and that the witness could not be found. In the case at bar it is not suggested that the absent witness was not fully cross-examined at the preliminary hearing upon all issues concerning which she gave testimony. It must therefore be conceded that at such preliminary hearing the prosecuting witness confronted the defendant. The object of the federal and state Constitutions is to provide a person who is being tried for a public offense full opportunity for cross-examination,

and this right appellant herein admittedly had exercised. (*People* v. *Bernstein, supra.*)

In the case with which we are here concerned there was no showing that the testimony in question would have been any different had the absent witness been present at the trial, nor was there any showing that evidence of an impeaching character had materialized since the preliminary examination. (*People* v. *Bernstein, supra,* at p. 469; *People* v. *Collup,* 27 Cal.2d 829 [167 P.2d 714].) The only showing made in support of the objection to reading the testimony of the prosecuting witness was the general statement of appellant's counsel that "Of course, it puts the defendant at a disadvantage. We have discovered other information, and we cannot cross-examine her on the trial." Such a showing was totally inadequate to bring the case within the rule enunciated by the Supreme Court in *People* v. *Collup, supra,* and relied upon by appellant. As was said by the trial judge, "Each individual case is decided on its individual set of facts." In the case at bar we are satisfied that a zealous and faithful effort was put forth to produce the prosecuting witness at the trial in the superior court and that no abuse of discretion was committed by the trial judge under the facts here present in determining that due diligence had been used and that it was "satisfactorily shown" that the witness could not "with due diligence be found within the state." (Pen. Code, § 686, subd. 3; *People* v. *Bernstein, supra.*)

Appellant's second contention is that the court fell into error in its ruling admitting evidence of other offenses committed by the defendant. In this regard the record reflects that while the witness Clarence W. Kissam, one of the investigating officers, was testifying, he was asked to relate a conversation had by him and other officers with the defendant following the latter's arrest. In answer to the interrogatory, the witness stated, "He told us that he had had trouble about similar cases like that. He said he might be walking down the street anywhere and have a sex desire and he was liable to break into a house and commit such an act." An objection and motion to strike on the grounds that the testimony was incompetent, irrelevant and immaterial was overruled. The witness then proceeded to testify further as follows: "I asked him at that time if . . . 'Was that the same procedure that you followed in the other case that you were in-

volved in when you was serving this time and that you are now on probation for?' He said, 'Yes.' He said he had known this woman before, had seen her around, and walked right up to this house, walked into the house and committed the act, and he started to tell us the whole story. He went on about how the moon affected him certain times of the month, that is what changed his feelings on the sex angle, . . . .''

■ While it is true that independent crimes, the evidence of which has no tendency to prove some material fact in connection with the particular crime charged, may not be proven against a defendant, that rule does not exclude evidence of such other crimes when the evidence thereof does tend to prove some material element of the crime for which the defendant is on trial. And the fact that the minds of the jurors might be prejudiced by inducing the belief that the defendant had been the perpetrator of another crime, is no ground for the exclusion of such evidence. (*People* v. *Nakis*, 184 Cal. 105, 114 [193 P. 92]; *People* v. *Wilson*, 46 Cal.App.2d 218, 224 [115 P.2d 598]; *People* v. *Morani*, 196 Cal. 154, 159 [236 P. 135]; *People* v. *Bernstein, supra;* 8 Cal.Jur. 60, § 168.) This well recognized exception to the general rule is frequently applied in cases where evidence of the crime tends to prove a motive for the commission of the crime charged; where a felonious or fraudulent intent, being a necessary element in the crime charged, the evidence of other crimes tends to establish and fix the existence of such motive or intent; and in cases where the evidence tending to establish the crime charged is intermixed with the evidence of the other offenses. ■ We are persuaded that the character of the offense charged in count I, viz., burglary, and the facts of the case bring it within the second condition just set forth. It was incumbent upon the prosecution in connection with proving the charge of burglary to satisfy the mind of the trier of fact beyond a reasonable doubt that the defendant entered the dwelling of the prosecuting witness with the intent then and there to commit the crime of rape. (Pen. Code, § 459.) Therefore, the statements volunteered by the defendant to the officer relating to his impulse to commit the same crime upon other occasions were clearly relevant and material in establishing the intent with which he entered the home of the complaining witness in the case on trial, notwithstanding that it incidentally disclosed the guilt

of the defendant of some offense other than the one for which he was on trial. █ It might also be here observed that on appeal a defendant is burdened not only with the duty of showing error, but also to establish that prejudice to him ensued from such error. (*People* v. *Horowitz,* 70 Cal.App.2d 675, 704 [161 P.2d 833].) In the instant case, whatever prejudice the defendant suffered was removed when, testifying as a witness in his own behalf, he was asked the following questions pursuant to the authority of section 2051 of the Code of Civil Procedure, and to which interrogatories he gave the answers herein narrated:

''Q. You have previously been convicted of burglary and the offense of attempted rape; is that correct? A. That is right, yes, sir.''

As was said by this court in *People* v. *Jeffries,* 47 Cal.App. 2d 801, 807 [119 P.2d 190], ''In view of appellant's decision voluntarily to become a witness in his own behalf, the prosecution was justified in eliciting from him on cross-examination, by way of impeachment, that he had suffered such prior felony conviction. Such being the case, he cannot now be heard to complain of any prejudice occurring from evidence of that fact having been presented to the jury.''

█ Appellant's final contention, that the judgments are contrary to law and to the evidence, does not call for extended notice. In this regard, appellant urges that the ''testimony introduced on behalf of the People is entirely discredited or inherently improbable to the extent that it is rendered of little value as evidence.'' This stricture upon the evidence which is hereinbefore set forth is without merit. The salutary rule and the reason therefor that an appellate tribunal will not ordinarily disturb a judgment of conviction upon the grounds of insufficiency of the evidence when there is a conflict of evidence, ought not to be lightly departed from. While the alleged variances or claimed inconsistencies in the testimony of the prosecuting witness, as well as the contradictions referred to, afforded opportunity for an argument to the trial judge against the reliability of her testimony, we see in them nothing from which a reviewing court could justly conclude that her entire testimony is per se improbable and that it was the duty of the trial judge not only to wholly disregard it but to accept the defendant's story or at least find that the latter's guilt had not been disclosed by evi-

dence to a moral certainty and beyond a reasonable doubt. Our views with reference to the functions of an appellate court when the claim is advanced that the judgment of conviction is not supported by the evidence are fully set forth in *People* v. *Ohman*, 67 Cal.App.2d 467, 474, 475, 476, 477 [154 P.2d 463], and are determinative of appellant's final contention in the case at bar. ██ The testimony of the prosecuting witness, that at the time the defendant made his attempt to accomplish his purpose, she grabbed his badge which contained his photograph and description and showed his place of employment, coupled with the fact that a few minutes after the occurrence defendant was present and was observed to be searching in the bedclothes and about the room, justified the inference by the court that he realized his failure to recover the badge would completely reveal his identity. Added to this are the inconsistent and admittedly false statements made by the defendant to one of the investigating officers, as well as the highly incriminating statements made by him and testified to by one of the officers. The defendant was fairly tried and under the evidence was justly convicted.

The judgments and the order denying defendant's motion for a new trial are, and each is, affirmed.

York, P. J., and Doran, J., concurred.