[Civ. No. 12975. First Dist., Div. One. Oct. 18, 1946.]

STATE OF CALIFORNIA et al., Respondents, v. C. B. DAY et al., Defendants; CARROLL S. BUCHER, Appellant.

A. Dal Thomson for Appellant.

Robert W. Kenny, Attorney General, and Carl W. Wynkoop, Deputy Attorney General, for Respondents.

WARD, J.—This action was instituted against C. B. Day and Carroll S. Bucher for alleged misapplication of money of the State Compensation Insurance Fund, (hereinafter referred to as the fund), and Massachusetts Bonding and Insurance Company, a corporation, as surety on a bond which is conditioned upon any designated act of wrongful abstraction, or willful misapplication, etc. of the funds of the fund. A second cause of action is based upon an alleged conspiracy founded upon the facts alleged in the first cause of action. Judgment was entered for the plaintiffs.

Defendant Day and the bonding company have not appealed, but a chronological statement of the acts of both Day and Bucher—those of the former commencing in 1936, and those of the latter not until a few days subsequent to January 27, 1937—is necessary to understand the participation of Bucher. Such a recital is also necessary to a statement and understanding of the position taken by the respective parties on the appeal. The findings are lengthy but they succinctly narrate the necessary facts as to Day and Bucher. There is evidence to support the findings against Day. If the trial court disbelieved Bucher, then there is substantial evidence against him. If credence should be given to his sworn statements, then the sufficiency of the evidence is, to say the least, problematical. Certain findings sustained by the evidence will be quoted, and excerpts of evidence given verbatim or in substance to indicate that the court's findings and judgment, insofar as they apply to Bucher, are substantially upheld by the evidence.

The pertinent findings applicable to the appeal by Bucher which are supported by evidence which may be declared substantial, appear as follows: ''1. Plaintiff State Compensation Insurance Fund is, and at all times herein mentioned was, a fund created by law and an agency of the State of California.

''2. C. B. Day, also known as Clark B. Day, was the duly appointed, qualified and acting Manager of said State Compensation Insurance Fund from December 1, 1934, to February 17, 1939. . . .

''5. On November 30, 1934, said C. B. Day, as principal, and said Massachusetts Bonding and Insurance Company, a Cor-

poration, as surety, executed, gave and delivered to State Compensation Insurance Fund an official bond for said C. B. Day, as Manager of said State Compensation Insurance Fund. . . .

"9. The condition of said bond was broken in this, that said C. B. Day while holding his said office and purporting to act in official discharge of certain duties appertaining thereto committed certain acts which did constitute acts of fraud, dishonesty, theft, wrongful abstraction or wilful misapplication in relation to the funds of State Compensation Insurance Fund and which acts were not in the faithful performance of the duties of said office and were in fact contrary to and in fraud of the rights of State Compensation Insurance Fund all as hereinafter set forth at length. . . .

"13. Each of said schedule bonds Nos. 41979 and 37149 was, during its said respective effective period, the official bond insuring State Compensation Insurance Fund against the wrongful acts of all employees of said State Compensation Insurance Fund, including said Carroll S. Bucher, and were conditioned alike and subject to the same terms and binding for the same breaches and as to the same class of persons. . . .

"18. During all the times hereinafter mentioned said C. B. Day and said Carroll S. Bucher, together with one Richard T. Hamilton, were officers and stockholders in the Tru-sheen Corporation, a corporation.

"19. One Clinton H. Resau was at one time an employee of the Gilro Machine and Stamping Co., a corporation, which said company during said employment was insured under a Workmen's Compensation Insurance policy of State Compensation Insurance Fund.

"20. Said Clinton H. Resau was and had been a very close friend of said C. B. Day for about fourteen or fifteen years prior to 1936, had gone on fishing trips with said C. B. Day nearly every year for twelve years during said time, and for a few years prior to and during 1936 had had dinner with said C. B. Day about once a week, accompanied by their respective wives and alternately visiting each other's home.

"21. Said Clinton H. Resau had been ill for several years, and early in 1936 he mentioned to said C. B. Day the fact that he thought his illness might be due to his work and that he thought he might be suffering from silicosis, whereupon said C. B. Day told said Clinton H. Resau he would be glad to have him sent to a doctor.

"22. On and immediately prior to February 6, 1936, said C. B. Day, while occupying said office of Manager of State Compensation Insurance Fund, advised and encouraged said Clinton H. Resau to file with State Compensation Insurance Fund a claim for compensation for an alleged industrial injury alleged to have been sustained while said Clinton H. Resau was in the employ of said Gilro Machine and Stamping Co., a corporation.

"23. Said claim of Clinton H. Resau, after said Clinton H. Resau had been given a medical examination by a physician selected by State Compensation Insurance Fund, was rejected as a compensable injury or condition.

"24. Following said rejection of the claim filed by said Clinton H. Resau, said C. B. Day, while still acting as Manager of State Compensation Insurance Fund, on March 26, 1936, procured the filing by said Clinton H. Resau with the Industrial Accident Commission of an application for adjustment of said claim; and said C. B. Day, despite being Manager of State Compensation Insurance Fund, acted throughout the matter of said claim including its procurement and the subsequent award based thereupon, solely and exclusively in the interests of said Clinton H. Resau, and to further satisfy the personal interests of said C. B. Day, as hereinafter more fully appears.

"25. When said claim was filed with said Industrial Accident Commission it became the legal duty of said C. B. Day to thoroughly investigate the facts relative thereto or to cause the same to be investigated, and to ascertain or cause to be ascertained whether the same was an allowable claim or whether it should be rejected; and whether, if and when a petition for adjustment of said claim should be filed with said Industrial Accident Commission the allowance of such claim should be resisted; but that said C. B. Day failed to properly or sufficiently investigate the said claim or to cause the same to be investigated, and by various means, including specific instructions to subordinates in the employ of State Compensation Insurance Fund as to the manner of handling said claim, and also including the failure to make a full and complete disclosure to the Industrial Accident Commission of all the known facts in reference to said claim, induced and secured the allowance of an award to said Clinton H. Resau upon said claim by the said Industrial Accident Commission.

"26. Said C. B. Day accomplished the said allowance of

said claim by means of the following acts in particular: Said C. B. Day told those of his subordinate employees of State Compensation Insurance Fund who were assigned to act upon said claim that said Clinton H. Resau was a personal friend of his, and that he believed the said Clinton H. Resau had suffered a compensable injury; said C. B. Day had said Clinton H. Resau kept under medical observation and had further medical examinations made until a report favorable to the allowance of said claim was had; said C. B. Day kept out of the record submitted to said Industrial Accident Commission any medical evidence other than that which was favorable to the granting and allowance of said claim, and in particular in this connection instructed the [then] attorney assigned to protect the interests of State Compensation Insurance Fund at the hearing before said Industrial Accident Commission to refrain, and said attorney did refrain, from raising any issue in the proceedings as to the occupational connection of the alleged injury or illness which was the basis of said claim, and this despite the fact that, but for the actions of said C. B. Day in the normal handling of said claim, the same had been rejected by the Claims Department of State Compensation Insurance Fund as not having any industrial connection; and said claim would have remained rejected but for the said acts of said C. B. Day, all of which acts were contrary to and inconsistent with the usual practice adhered to by the State Compensation Insurance Fund and were designed by C. B. Day to and did influence and contribute to the granting of an award to said Clinton H. Resau; for said claim was in fact a questionable one in that the industrial nature of the alleged injury upon which said claim was based was highly controversial and would ordinarily have been carefully investigated and examined by State Compensation Insurance Fund and the said Industrial Accident Commission, and allowance of said claim would have been seriously contested by State Compensation Insurance Fund but for the said acts of said C. B. Day and the said acts of said C. B. Day did prevent a full and fair hearing of said claim upon its merits, and but for said acts of said C. B. Day said claim would have been rejected by said Industrial Accident Commission; and all of the said acts of said C. B. Day were done to the neglect of and were inconsistent with the official duties of said C. B. Day, and were in breach of his official bond, con-

trary to the interests of State Compensation Insurance Fund and to the damage of State Compensation Insurance Fund.

"27. Said award of said Industrial Accident Commission was made on April 20, 1936, and was in favor of said Clinton H. Resau for the sum of Eighty-eight and 92/100 Dollars ($88.92), payable forthwith, and Twenty-two and 23/100 Dollars ($22.23) per week, commencing April 18, 1936, said weekly payments to continue during continuance of disability.

"28. Thereafter, and on June 25, 1936, said Industrial Accident Commission made its further order fixing a permanent disability rating for said award as follows: Twenty-two and 23/100 Dollars ($22.23) per week, beginning March 21, 1936, until two hundred and forty (240) weekly payments should have been made, and thereafter Thirteen and 68/100 Dollars ($13.68) per week for the remainder of the natural life of said Clinton H. Resau.

"29. Pursuant to the said award and the several orders aforesaid of the said Industrial Accident Commission, State Compensation Insurance Fund paid to said Clinton H. Resau, and on account of said award and order, a total of One Thousand Two Hundred Nine and 02/100 Dollars ($1209.02), of which amount One Thousand Forty-four and 81/100 Dollars ($1044.81) was paid out in indemnity payments and One Hundred Sixty-Four and 21/100 ($164.21) was paid out on account of medical services and expenses incurred by State Compensation Insurance Fund on account of said Clinton H. Resau.

"30. In the latter part of January, 1937, said C. B. Day further induced said Clinton H. Resau to apply to State Compensation Insurance Fund and to said Industrial Accident Commission, and said Clinton H. Resau did so apply for a commutation of the said award and orders to a lump sum payment, and by and with the assistance and advice of said Carroll S. Bucher, who had become counsel of State Compensation Insurance Fund on January 27, 1937, secured the granting of said commutation by said Industrial Accident Commission; said acts of said C. B. Day and said Carroll S. Bucher were done in the interests of and because of the friendship of said C. B. Day with said Clinton H. Resau, and also for the personal advantage of said C. B. Day and in order to furnish said Clinton H. Resau with sufficient money to invest in said Tru-Sheen Corporation, a corporation.

"31. Upon the filing by said Clinton H. Resau of said

application for commutation of award, by virtue of their said official positions, it became the duty of both C. B. Day and said Carroll S. Bucher to thoroughly investigate the same, or cause the same to be investigated, and to weigh the advisability of approving or resisting the same and to make a recommendation respecting the granting or denial of said application to said Industrial Accident Commission; but both and each of them failed and neglected to either investigate said application or cause the same to be investigated, or to consider the possibility of resisting it or to resist it, and, on the contrary, forthwith approved and caused the same to be approved and hurried through, and made every effort to have the same granted by said Industrial Accident Commission.

"32. A proper or any investigation of the facts would have disclosed that at the time said application for commutation was filed the said Clinton H. Resau could be expected to live but a short time, that the aneurism of the abdominal aorta might rupture at any time causing immediate death, and that the life expectancy of said Clinton H. Resau was further impaired by reason of an amputated leg.

"33. Shortly prior to February 8, 1937, the said C. B. Day ascertained or caused to be ascertained from Robert E. Haggard, superintendent of the permanent disability rating bureau of said Industrial Accident Commission, the value of a commutation of the life pension awarded said Clinton H. Resau; upon ascertaining said commutation value, said C. B. Day instructed said Carroll S. Bucher, who just a few days before had been appointed by said C. B. Day to be Chief Counsel of State Compensation Insurance Fund, to prepare a stipulation authorizing said Industrial Accident Commission to make a commutation of said permanent disability rating and life pension; in furtherance of said commutation said C. B. Day consulted with Frank McDonald, one of the duly appointed, qualified and acting Commissioners of said Industrial Accident Commission and assured him that the said Clinton H. Resau and his wife would never become public charges of the State of California if the said Industrial Accident Commission should grant said commutation; it was further represented to the Commissioner Frank McDonald that upon the granting of said commutation said Clinton H. Resau and his wife would go back East to make their home with a brother of said Clinton H. Resau.

"34. Pursuant to said instructions of said C. B. Day, said

Carroll S. Bucher prepared a stipulation authorizing said Industrial Accident Commission to commute said permanent disability rating and life pension; said stipulation was dated February 8, 1937, was filed with said Industrial Accident Commission the same day, on the same day the said Industrial Accident Commission made and issued its order granting said commutation, and on the same day a check in full payment of said commutation was executed and delivered to said Clinton H. Resau.

"35. Said stipulation authorizing said commutation was handled exclusively by said C. B. Day and said Carroll S. Bucher; the usual and regular procedure followed by State Compensation Insurance Fund in the handling of such matters was not followed; the request for commutation was not submitted to the committee established to pass upon such requests; the matter was not referred to the Claims Department for review and recommendation; and the said Carroll S. Bucher, as Chief Counsel of said State Compensation Insurance Fund, did not consult with any other member of the Legal Department of said State Compensation Insurance Fund nor did he refer said stipulation to the attorney who had previously handled proceedings in said Clinton H. Resau case before said Industrial Accident Commission; rather the entire matter regarding said stipulation was handled exclusively by the said C. B. Day and said Carroll S. Bucher, without the knowledge or consent of any other employee of State Compensation Insurance Fund, despite the fact that said C. B. Day had never known of a similar instance of a commutation of a 100% permanent disability rating and life pension.

"36. In presenting said stipulation to said Industrial Accident Commission the said C. B. Day and said Carroll S. Bucher did not advise said Industrial Accident Commission of any circumstances which did or would tend to reduce the life expectancy of said Clinton H. Resau, even though at the time of filing said stipulation with said Industrial Accident Commission the said C. B. Day and Carroll S. Bucher knew that said Clinton H. Resau had had one leg amputated and that he might suffer a rupture of said aneurism at any time causing immediate death; further, said C. B. Day and said Carroll S. Bucher did not have said Clinton H. Resau examined medically to determine at the time said stipulation was filed with said Industrial Accident Commission whether there had been any change in or what was the life expectancy of said Clinton

H. Resau, nor did the said C. B. Day or said Carroll S. Bucher take any steps to see that the best interests of State Compensation Insurance Fund were protected therein.

"37. Through the efforts of said C. B. Day and said Carroll S. Bucher and solely by reason thereof and by reason of representations made by them to said Industrial Accident Commission the said application was commuted to cash by said Industrial Accident Commission.

"38. Pursuant to said commutation, on or about February 8, 1937, State Compensation Insurance Fund paid to said Clinton H. Resau the sum of Six Thousand Nine Hundred Sixty-two and 56/100 Dollars ($6962.56) in full satisfaction of said award and in commutation thereof.

"39. On or about February 10, 1937, said Clinton H. Resau paid out of the said commutation payment of Six Thousand Nine Hundred Sixty-two and 56/100 Dollars ($6962.56), the sum of Two Thousand Four Hundred Dollars ($2400.00) in a cashier's check made payable to said R. T. Hamilton. Said cashier's check was endorsed by said R. T. Hamilton and said C. B. Day, cashed, and the proceeds placed in a safe deposit box which the said C. B. Day, said Carroll S. Bucher, and said R. T. Hamilton thereupon rented under an agreement whereby said safe deposit box could be opened only in the presence of at least two of said three persons.

"40. Thereafter the said Clinton H. Resau made further payments of One Thousand Dollars ($1000.00) on April 22, 1937, and Two Thousand Dollars ($2000.00) on May 21, 1937, making a total sum paid by said Clinton H. Resau to said C. B. Day, said R. T. Hamilton, and said Carroll S. Bucher of Five Thousand Four Hundred Dollars ($5400.00).

"41. Said commuted lump sum of Six Thousand Nine Hundred Sixty-two and 56/100 Dollars ($6962.56) was greatly in excess of the aggregate of any weekly indemnity payments which it reasonably could be expected said Clinton H. Resau would be entitled to under the previous said award, to the knowledge of said C. B. Day and said Carroll S. Bucher and each of them, but in spite of said knowledge said C. B. Day and said Carroll S. Bucher and each of them approved and agreed to said application and caused the same to be approved and agreed to in violation of their respective duties and in breach of their said bonds and contrary to the interests of State Compensation Insurance Fund, and to the damage of the State Compensation Insurance Fund.''

The findings continue upon practically the same facts as previously stated and set forth that a conspiracy was formed about February 6, 1936, with "other persons unknown" to do the alleged wrongful acts and to refrain from performing certain official duties. Bucher's connection with the alleged conspiracy is fixed as of the date he became counsel for the State Compensation Insurance Fund in the latter part of the month of January, 1937.

The findings further provide: "47. It was the purpose and object of said C. B. Day and said Carroll S. Bucher at that stage of the conspiracy to obtain the commutation for said Clinton H. Resau in order to put said Clinton H. Resau in possession of money that he would then loan or give or turn over to said C. B. Day or said Carroll S. Bucher for the purpose of financing said Tru-Sheen Corporation, a corporation, of which corporation said C. B. Day and said Carroll S. Bucher were then officers." There is also evidence that a day or two following the payment of the commuted award Day requested Bucher to meet him at a bank in San Francisco. It there developed that Resau was loaning part of the award to the Tru-Sheen company in which Day and one Hamilton owned stock, and Bucher, the attorney and secretary-treasurer, had been paid in shares of stock for legal services rendered. The money advanced by Resau was not deposited with a bank but was placed in a safe deposit box, which could only be opened by any two of the three parties mentioned.

In the narrative statement of the evidence, certified by the trial judge as a "full and correct narrative statement of the testimony taken, and the evidence adduced, at the trial" appears, as part of the testimony of appellant, Bucher, the following: "I next heard of Mr. Resau a few days after the commutation. That was in connection with the safe deposit box transaction. Mr. Day telephoned me to come down to the Anglo Bank at the corner of McAllister and Market Streets. I went down there and met Mr. Day and also Mr. Hamilton. Mr. Day told me that they had borrowed some money from Mr. Resau and he then, for the first time, called my attention to the fact that Mr. Resau was the man for whom a commutation had been made, that the Tru-Sheen Corporation had borrowed this money from Mr. Resau and that they desired to put it in the safe deposit box in the Bank. I asked him why they were putting it in the safe deposit box and he said there was a man who was the manager of the Company who

would be inclined to pay the money out more rapidly than it should be. The safe deposit box was opened in the names of all three of us, with any two to have access to it.

"I had nothing to do with the notes that were given to Mr. Resau for the loans. I never saw Mr. Resau at any time."

According to Day, when Resau received the check Mrs. Resau was physically ill and Resau determined that he would not go east—though eventually they journeyed to Resau's brother's home in the city of Baltimore. According to Day, Resau wanted to invest part of the money in securities that would return an income.

There is evidence that Bucher had never met Resau personally at any time during the various transactions, or knew anything about the industrial accident claim. Bucher was directed by Day within a short time after his appointment as counsel for the fund to prepare a commutation of award. The directions were followed and Bucher, as attorney for the fund, signed the stipulation. Where an application for commutation is presented by stipulation its passage or approval by the Industrial Accident Commission is automatic if the referee of the Industrial Accident Commission is satisfied after an examination of the file that it complies with Labor Code section 5100. In this case the referee of the Industrial Accident Commission not only approved the commutation but had the statisticians fix the amount, whereupon the referee prepared the order, which was duly approved by the commission.

There is some evidence that Day told officials and employees of the fund that Resau was his friend. Bucher did not deny that this information was given him, but stated in that regard that he could not remember. Whether the preparation of the stipulation of commutation by Bucher was an act that should have put Bucher on guard against a misapplication of funds is a question of fact. Bucher had 25 or more years of experience in the practice of industrial cases. There is evidence that the usual practice was to refer all commutations exceeding $500 to a committee to examine, and make recommendations to the manager of the fund, and that life pension cases were few in number. There is also evidence that the "committee" was not in existence, and other evidence that various officials and employees of the fund did not remember whether it existed at the time of the Resau commutation transaction.

The rules necessary to establish the quantum of proof

of fraud or a conspiracy are stated in *Campbell* v. *Birch,* 19 Cal.2d 778, 789 [122 P.2d 902], as follows: "The trial court is the exclusive judge of the weight of the evidence and the credibility of the witnesses. It is its province to give to the evidence that weight to which, in its judgment, it is entitled, and to draw all reasonable inferences therefrom, and if, in its judgment, the evidence is entitled to no weight it may disregard such evidence altogether. (24 Cal.Jur. 886, sec. 135.) The cases have frequently taken notice of the fact that it is next to impossible to secure direct evidence of a conspiracy, unless one of the participants has confessed, and that the proof must usually be inferential and circumstantial." In *People* v. *Yant,* 26 Cal.App.2d 725, 737 [80 P.2d 506], the court said: "It is not often that the direct fact of an unlawful agreement which is the essence of a conspiracy can be proved otherwise than by the establishment of independent facts bearing upon the common design; and the question as to the existence of the conspiracy being one of fact, it is sufficient if the circumstances proved satisfy the jury, leaving the weight and sufficiency of the evidence to the triers of the questions of fact. (*People* v. *Sampsell,* 104 Cal.App. 431, 439 [286 P. 434].)" (See, also, *Johnstone* v. *Morris,* 210 Cal. 580 [292 P. 970]; *Revert* v. *Hesse,* 184 Cal. 295 [193 P. 943]; *People* v. *Kauffman,* 152 Cal. 331 [92 P. 861]; *Beeman* v. *Richardson,* 185 Cal. 280 [196 P. 774].) The trial court heard all of the evidence covering the securing of the commutation and the loan to a company in which Bucher held stock. Appellant contends that there is insufficient evidence to establish any wrongdoing on his part. The trial court evidently disbelieved his testimony. "In determining the disputed questions of fact presented at the trial of the case it was the province of the jury to disbelieve any testimony which appeared to them to lack verity. They were the exclusive judges of the credibility of the witnesses and the weight to be given their testimony. They could reject positive testimony and accept circumstantial evidence as proof of the facts, as it is elementary that direct evidence may be disbelieved and contrary circumstantial evidence relied upon to support a verdict or finding." (*Gray* v. *Southern Pacific Co.,* 23 Cal.2d 632, 640-641 [145 P.2d 561].)

Unless mandatory presumptions are prescribed by statute, and in the absence of a question of law, it is the duty of the court or jury (Code Civ. Proc., §§ 2101, 2061) as the case may be, to deduce an inference from a fact legally proved

(Code Civ. Proc., § 1958), or on a reasonable deduction based on such fact in conformity with the ordinary propensities or passions of men generally or of the particular person involved. The deduction may also be founded on the course of business or of nature. (Code Civ. Proc., § 1960.) "From the secrecy with which unlawful undertakings are adopted it would be generally impossible to make such proof by direct testimony. Evidence is indirect as well as direct,—consisting of inferences and presumptions,—and it is code law that upon the trial of a case evidence may be given of any facts from which the facts in issue are presumed or are logically inferable." (*People* v. *Donnolly,* 143 Cal. 394, 398 [77 P. 177].) Inferences which reasonably may be drawn from the evidence and which are legally admissible notwithstanding that a contrary inference might be drawn by an appellate court, must be accepted on appeal as evidence in favor of the prevailing party. The inference drawn by the trial court may not be the inference which the individual members of this court might draw. "The fact that some inference other than that which has been drawn by a jury may appear to an appellate tribunal to be the more reasonable, affords no sufficient reason for disturbing the inference in question. (10 Cal.Jur., p. 735, et seq.) It also appears to be well-established law that notwithstanding the fact that the evidence upon which the inference is founded is undisputed or without conflict, an appellate court has not the power to draw an inference different from that which the jury has deduced." (*Juchert* v. *California Water Service Co.,* 16 Cal.2d 500, 508 [106 P.2d 886].) (See, also, *Mah See* v. *Northern American Acc. Ins. Co.,* 190 Cal. 421 [213 P. 42, 26 A.L.R. 123]; *Webster* v. *Board of Dental Examiners,* 17 Cal.2d 534 [110 P.2d 992]; *Hamilton* v. *Pacific Elec. Ry. Co.,* 12 Cal.2d 598 [86 P.2d 829]; *Barham* v. *Widing,* 210 Cal. 206 [291 P. 173]; *Arques* v. *National Superior Co.,* 67 Cal.App.2d 763 [155 P.2d 643]; *Palmer* v. *Palmer,* 49 Cal. App.2d 331 [121 P.2d 822].)

 The trial court, with the above rules in mind, could consider the long standing friendship between Day and Bucher; the fact that Bucher was selected by Day from three names submitted by the personnel board for appointment as chief counsel for the fund; Bucher's long experience with the particular class of work; the fact that he might have made an independent investigation; the preparation of the stipulation of the commutation of the award; the fact that Bucher signed

the stipulation as the legal representative of the compensation fund; the assent finally given to the deposit of the Resau money in a safe deposit box instead of with a bank; Bucher's actions and demeanor as a witness, to determine his credibility and participation in the scheme of Day.

Appellant cites *Ryder* v. *Bamberger*, 172 Cal. 791 [158 P. 753], and other cases to the same effect that it is the duty of the trial court to find in favor of fair dealing if there be two inferences that are equally susceptible of being adopted from all the facts and circumstances. The rule is set forth in *Ryder* v. *Bamberger, supra,* as follows (pp. 799-800) : "For, if there be two inferences equally reasonable and equally susceptible of being drawn from the proved facts, the one favoring fair dealing and the other favoring corrupt practice, it is the express duty of court or jury to draw the inference favorable to fair dealing." The rule is applicable when the evidence is equally susceptible of two conflicting inferences. The opinion in the case of *Ryder* v. *Bamberger, supra,* page 800, seems to be that there was no substantial evidence of fraud. In the other cases cited the same principle is involved. In the present case, the testimony of Bucher was considered, but disbelieved. Added to that circumstance is the evident attitude of the trial court showing that he disbelieved any testimony of Day favorable to Bucher. This was the trial court's right. (*Campbell* v. *Birch, supra.*) This court as a matter of law is unable to say that the evidence is insufficient to sustain the findings and judgment.

The trial court decided this case on the theory of intentional wrong on the part of Day and Bucher, and a conspiracy between them to defraud the state; and that an agent of the state is jointly responsible with his coconspirator for damages suffered. (Civ. Code, § 2343, subd. 3; *Stirnus* v. *Adams,* 50 Cal.App. 730 [195 P. 955].) "In an action for damages resulting from acts of conspirators, the major significance of the conspiracy lies in the fact that it renders each participant in the wrongful act responsible as a joint tort-feasor for all damages ensuing from the wrong, irrespective of whether or not he was a direct actor and regardless of the degree of his activity. And so, a plaintiff is entitled to a joint recovery of damages against such defendants as he can show have united or cooperated in inflicting a wrong upon him. A person is liable for his participation in a conspiracy, having for its object the commission of a wrongful act, even though he acts only as an

agent for another and is unacquainted with the details of the scheme, and although he expected no benefit from the wrongful act and in fact received none.'' (5 Cal.Jur. § 30, p. 530; *Mox, Incorporated* v. *Woods,* 202 Cal. 675 [262 P. 302]; *Revert* v. *Hesse, supra; Mary Pickford Co.* v. *Bayly Bros., Inc.,* 12 Cal.2d 501 [86 P.2d 102].) ▓ Bucher, found to be a conspirator, and found to have been a participant in a wrongful act, is, in the eyes of the law, equally liable with Day for the wrong perpetrated, though he may not have known the details of the scheme from its inception. They were joint tort feasors and liable equally for the full amount of damages. Day did not appeal from the judgment and it has become final as to him. ▓ Respondents have not appealed from the judgment and, therefore, are not in a position to urge the point that as joint tort feasors Bucher's liability should be the same as Day's. The amount assessed against Bucher, in the absence of an appeal by the respondents, must stand.

The judgment against Bucher represents compensation for a permanent disability of Resau of 100 per cent as found by the Industrial Accident Commission, entitling him to $5,335.20, to be paid at the rate of $22.23 a week for 240 weeks, and thereafter the sum of $13.68 a week for the remainder of his natural life. The prospective term of Resau's natural life was of course uncertain. The chief of the compensation bureau of the commission testified in substance, as related in the narrative statement on appeal, that commutation is based primarily upon the amount of future payments, in turn based upon the normal expectancy of life; that the commission in making the permanent disability rating considered a well recognized mortality table, the history of the case, the condition of the ailment of the applicant, plus the experience of the commission in similar computations.

The trial court did not fix the amount of damages arbitrarily nor compute the various amounts mentioned during the trial of the case as a basis for damages, but followed the order of the Industrial Accident Commission which had previously fixed the amount, without appeal from that order by any of the parties interested. The order of the commission has long since become final.

Appellant contends (1) that respondents offered no evidence tending to show the amount for which the claim should have been commuted; (2) that, if the claim had not been commuted the fund would have been obliged to pay the death benefit,

from which the accrued compensation should have been deducted. ■ As to the first contention, since the conspiracy prevented a determination of the amount for which the claim should have been commuted, appellant cannot be heard to complain. ''The most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created.'' (*Bigelow* v. *RKO Radio Pictures, Inc.*, —— U.S. —— [66 S.Ct. 574, 580, 90 L.Ed. ——] ; see, also, *Speegle* v. *Board of Fire Underwriters*, 29 Cal.2d 34, 46 [172 P.2d 867].) ■ On the second point, no citations are given and no argument presented in support of the bare statement. Under such circumstances the matter complained of will be deemed to be without prejudice to appellant's rights. (*People* v. *Hermes*, 73 Cal.App.2d 947 [168 P.2d 44], and cases cited.)

The prayer of the complaint asks for judgment against Day, Bucher and the bonding company in the sum of $8,171.58 ''together with interest thereon.'' The figure $8,171.58 was evidently arrived at by adding to the $6,962.56, the amount of the commuted award, the sum $1,044.81, the previous indemnity payments made to Resau, and $164.21, paid for medical services and expenses. The judgment provides: ''1. That plaintiffs have and recover from defendants C. B. Day, Carroll S. Bucher and Massachusetts Bonding and Insurance Company, a corporation, the total sum of Twelve Thousand Nine Hundred Forty-five and 36/100 Dollars ($12,945.36) being the principal sum of Eight Thousand One Hundred Seventy-one and 58/100 Dollars ($8,171.58) together with interest thereon at the rate of Seven per centum (7%) per annum, compounded annually from February 8, 1937, to and including November 25, 1943, in the sum of Four Thousand Seven Hundred Seventy-three and 78/100 Dollars ($4,773.78), except, however, as to the defendant Carroll S. Bucher only plaintiffs have and recover the sum of Eleven Thousand Thirty-one and 97/100 Dollars ($11,031.97), being the principal sum of Six Thousand Nine Hundred Sixty-two and 56/100 Dollars ($6,962.56) together with interest thereon at the rate of Seven per centum (7%) per annum, compounded annually from February 8, 1937, to and including November 25, 1943.

''2. That plaintiffs have and recover from defendants C. B. Day, Carroll S. Bucher, and Massachusetts Bonding and Insurance Company, a corporation, interest at the rate of seven

per centum (7%) per annum compounded annually on the sum of Twelve Thousand Nine Hundred Forty-five and 36/100 Dollars ($12,945.36) from November 25, 1943; except, however, as to defendant Carroll S. Bucher interest as aforesaid shall be computed upon the principal sum of Eleven Thousand Thirty-one and 97/100 Dollars ($11,031.97)."

The judgment is dated April 19, 1944, and recorded April 20, 1944. The record, insofar as this court has been able to discover, does not disclose why November 25, 1943, was selected as a stopping point in the payment of interest, nor why there should be assessed on the first amount compound interest from that date as if it were the date of judgment. ■ It has been suggested that November 25, 1943, is the date of the order for preparation of findings and judgment, and that it automatically terminates the period of payment of interest prior to judgment. *United Taxpayers Co.* v. *San Francisco,* 55 Cal. App. 239 [203 P. 120], does not sustain such suggestion. At page 243 the court said: "An order for judgment is not a judgment. (*Delger* v. *Jacobs,* 19 Cal.App. 197 [125 P. 258]; *Canadian etc. Co.* v. *Clarita etc. Co.,* 140 Cal. 672 [74 P. 301].) Interest, by the express language of section 1920 of the Civil Code, is allowable upon judgments from the date of their entry only." In *Walters* v. *Bank of America etc. Assn.,* 9 Cal. 2d 46, 58 [69 P.2d 839], the court stated: "The trial court allowed interest from May 10, 1930, the date of the attachment. The respondent's right to interest did not accrue until July 14, 1930, the date of the judgment. The judgment should be modified to correct that error." (See, also, *Bibend* v. *Liverpool & London F. & L. Ins. Co.,* 30 Cal. 78; *Clark* v. *deSaisset,* 5 Cal.App.2d 23 [41 P.2d 945]; *Wells Fargo & Co.* v. *City etc. of San Francisco,* 25 Cal.2d 37 [152 P.2d 625].) In *Gillanders* v. *Da Silva,* 212 Cal. 626 [299 P. 722], an action to reform a liability indemnity insurance policy, the form of the judgment resulted in a compounding of interest on the original judgment. The court said (p. 632): "Obviously this was an allowance of interest on interest for which there appears to be no authority in law in such a case." The order of the trial court was affirmed after modification of the amount. Whatever interest may be due in this case it will be necessary to order a modification, though the date November 25, 1943, assumed to be the date of the order for judgment, is not of great importance as the interest rule applies in this case.

■ The first matter to be considered on the subject of

damages is whether the compound interest was proper in this case. The compounding of interest has not been approved, legislatively or judicially, in this state in a case like the present. (*Doe* v. *Vallejo*, 29 Cal. 385; *Yndart* v. *Den*, 116 Cal. 533 [48 P. 618, 58 Am.St.Rep. 200]; *Schneider* v. *Turner*, 10 Cal.2d 771 [76 P.2d 668].)

"It should also be noted that the Legislature has expressly provided that 'in the computation of interest upon any bond, note, or other instrument or agreement, interest shall not be compounded, nor shall the interest thereon be construed to bear interest *unless an agreement to that effect is clearly expressed in writing* and signed by the party to be charged therewith.' (Emphasis ours.) (Deering's Gen. Laws (1937), Act 3757, § 2; Stats. 1919, p. lxxxiii.)

"How the defendant expects the court to imply an agreement to pay compound interest in view of this statute, he does not explain." (*Robertson* v. *Dodson*, 54 Cal.App.2d 661, 665 [129 P.2d 726].)

The legal rate of interest in this state is seven per centum. (Cal. Const. art. XX, § 22.) The general rule is that interest may not be computed on accrued interest unless by special statutory provision, or by stipulation of the parties, and in the latter event the amount may not be fixed in conflict with statutory provisions. (*Yndart* v. *Den, supra*; Usury Law, Stats. 1919, p. lxxxiii and Deering's Cal. Gen. Laws, Act 3757, et seq.; *Schneider* v. *Turner, supra*.)

In *City of Los Angeles* v. *Aitken*, 32 Cal.App.2d 524 [90 P.2d 377], 531-532, a condemnation proceeding, it was held that the interlocutory decree "becomes a 'judgment' within the meaning of section 22, article XX, of the Constitution, and that pending an appeal by the condemnor, such judgment bears interest at the legal rate from the expiration of thirty days after its entry until paid. As we have stated, this is the precise situation which is found in any ordinary action for the recovery of a money judgment, and we see no valid reason why interest upon the judgment here should not be recovered as it is recovered in other cases."

"One who willfully deceives another with intent to induce him to alter his position to his injury or risk, is liable for any damage which he thereby suffers." (Civ. Code, § 1709.) "Every person who is entitled to recover damages certain, or capable of being made certain by calculation, and the right to recover which is vested in him upon a particular day, is en-

titled also to recover interest thereon from that day, except during such time as the debtor is prevented by law, or by the act of the creditor, from paying the debt.'' (Civ. Code, § 3287.) ''The damages prescribed by this chapter are exclusive of exemplary damages and interest, except where those are expressly mentioned.'' (Civ. Code, § 3357.) Civil Code section 3288 provides: ''In an action for the breach of an obligation not arising from contract, and in every case of oppression, fraud, or malice, interest may be given, in the discretion of the jury.'' The discretion of the court does not include the right to make an order for interest upon interest because that would constitute a penalty over and above that expressly allowed in cases of oppression, fraud or malice. (Civ. Code, § 3294.) The claim here involved was originally determined by the Industrial Accident Commission and subsequently declared by such commission to be based upon a permanent disability wherein interest was fixed by statute ''at the rate of six per cent per annum.'' (Lab. Code, § 5101(b).) The amount of the principal in this case was capable of being made certain (Civ. Code, § 3287), and in fact was made certain by the action of the Industrial Accident Commission in the sum of $6,962.56, the commutation award.

The court explicitly found Bucher joined and entered into said conspiracy shortly after the time he became counsel of State Compensation Insurance Fund on or about January 27, 1937, and decreed that while the judgment against Day should be in the sum of $8,171.58, Bucher should be held liable for a lesser amount—$6,962.56.

Respondents at the time of oral argument admitted that appellant ''might be'' right on the question of compound interest. Under the cited cases and code sections it appears that simple interest at the legal rate may be charged against Bucher, but not compound interest.

The trial court evidently adopted the view that the fund was deprived of the use of $6,962.56 — the amount of the commutation wherein Bucher played a part—on February 8, 1937. The respondents did not appeal from the amount of the judgment against Bucher, and hence may not object to it in that respect. ▮ The court fixed the date for the commencement of interest on the $6,962.56 as February 8, 1937. The record does not disclose that plaintiffs requested interest from about February 6, 1936, the inception of the conspiracy. The allowance of interest in a fraud case

prior to judgment is in the discretion of the trial court. Though Day and Bucher were equally culpable from the inception of the conspiracy, the particular sum of $6,962.56 was not paid out until February 8, 1937. The fund may have been deprived of other money prior to that date, for which Day may have been responsible as a conspirator, and Bucher as a subsequent aider and abettor. But, right or wrong, the trial court has seen fit to hold Bucher only for the $6,962.56, the amount of the commuted award. Since the state was deprived of that sum on February 8, 1937, it is quite clear that interest, which the court in its discretion has determined should be paid, should start on that date. Since the trial court has seen fit, right or wrong, to exonerate Bucher for liability for the other principal sum involved, and the respondents have not appealed, it would appear that Bucher could not be made to pay interest on that principal sum for which he was held not liable.

The trial court is directed to modify the findings and the judgment against Bucher by striking out all amounts representing compound interest and inserting in lieu thereof simple interest at the legal rate from February 8, 1937, continuing until the judgment is paid. When so modified under the direction of the trial court, the judgment will stand affirmed; each side to pay its own costs.

Peters, P. J., and Schottky, J. pro tem., concurred.