18 Cal.App.3d 565 (1971)
95 Cal. Rptr. 816
Estate of THOMAS E. SHARP, Deceased.
TITLE INSURANCE AND TRUST COMPANY, as Executor, etc., Petitioner and Respondent,
v.
SAN DIEGO HOSPITAL ASSOCIATION et al., Objectors and Appellants.
Docket No. 10178.
Court of Appeals of California, Fourth District, Division One.
June 30, 1971.
*568 COUNSEL
Procopio, Cory, Hargreaves & Savitch, Gerald M. Dawson, Ferguson, Ferguson & Newburn, Glenn, Wright, Jacobs & Schell and Leroy A. Wright for Objectors and Appellants.
Scales, Patton, Ellsworth & Corbett and Leon W. Scales for Petitioner and Respondent.
OPINION
WHELAN, J.
Thomas E. Sharp (testator), a man of wealth, died November 29, 1959, in his sixty-ninth year, in San Diego, his place of residence.
His typewritten will of 42 pages, dated October 12, 1955, with a typewritten codicil of 11 pages, dated April 24, 1958, was admitted to probate on December 18, 1959. Title Insurance and Trust Company (Title) was named and qualified as executor.
Administration proceedings were long and complicated. Some of the assets of not less than $18,000,000 subject to disposition by will, were held by four banks in New York, five banks in three Australian cities, several banks in San Diego, and banks in Chicago, Canada and London. Ancillary probate proceedings were had with regard to real property interests in Nevada and Texas. The dissolution of five wholly owned corporations was necessary.
*569 The determination of death taxes involved the appraisal of the assets of and dealings with the trustees of 13 different inter vivos trusts, including one in Canada.
The California inheritance tax was fixed at $2,552,613.89. The federal estate tax liability was finally determined in September 1966 to be $10,249,185.17. That was the result of an agreement approved by joint congressional committee in a Tax Court proceeding to contest a delinquency assessment of $5,009,525.81 after the filing of a timely return showing an estimated tax of $11,171,402.35.
San Diego Hospital Association (Hospital), owner of the Donald L. Sharp Memorial Community Hospital, and Continental Illinois National Bank and Trust Company of Chicago (Bank) have separately appealed from a judgment determining the amount of Hospital's bequest under testator's will and codicil.
Bank, as trustee under trust No. 40680, created by the testator during his lifetime, is the residuary legatee under the will and codicil.
The primary issue on appeal is the proper method of computing the amount of Hospital's bequest.
Both will and codicil were carefully drafted by the testator. The will, in article seven, section 3, provided for a bequest to Hospital as follows: "I hereby give, devise and bequeath to the SAN DIEGO HOSPITAL ASSOCIATION ... FIFTY THOUSAND DOLLARS ($50,000.00), provided that the Directors [thereof] will use the said bequest as a portion of the Building Fund for structural additions to the existing hospital, or for the erection of additional buildings (such as a dormitory for nurses, or a convalescent unit) on the grounds of, or adjacent to the existing [hospital]."
That bequest was cancelled and another made in its stead by the following provisions of the codicil: "I hereby cancel and annul each and all of the sections, in their entirety, of ARTICLE SEVEN... of [my] Will ... and in lieu of such cancelled and annulled sections the following sections are hereby substituted and hereafter shall be of full force and effect:
"Section (1): ...
"I hereby give and bequeath to the said SAN DIEGO HOSPITAL ASSOCIATION ... the following: "Such an amount as shall be equal to one-tenth (1/10th) of the value of that portion of my estate which shall remain prior to the deduction of any and all State and/or Federal death or inheritance taxes, but after the deduction of Probate and Administration expenses of my said estate, including proper debts, attorneys' fees, executors' fees, accountants' fees, appraisers' fees, court costs, etc.
*570 "For the purpose of determining what constitutes the aforementioned one-tenth (1/10th) of the value of the said portion of my said estate, the following shall be deemed to be a part of, and shall be included in the said one-tenth (1/10th) of the portion of my estate referred to in the paragraph immediately preceding:
"(D) The appraised value of any and all real property bequeathed by me to the said SAN DIEGO HOSPITAL ASSOCIATION under my Last Will and Testament and/or under any Codicil thereto; and
"(E) The appraised value of the Corpus of Trust No. 34365 ... if the said Trust ... shall be in existence at the time of my death and if the Trust Instrument, at the time of my death, provides for the distribution of the Corpus of the said Trust, upon its termination, to the said SAN DIEGO HOSPITAL ASSOCIATION; and
"(F) The appraised value of the corpus of such other Trusts (if any) as shall have been created by me, and shall be in existence at the time of my death, and the Trust Estates of which will be distributed to the SAN DIEGO HOSPITAL ASSOCIATION upon the termination of such Trust or Trusts."
This court has determined that the bequest to Hospital was a general pecuniary legacy.[1] The method of determining the amount thereof is discussed hereafter.
Hospital finds fault with the decision of the lower court insofar as the lower court held (1) that the value of the corpora of the revocable but unrevoked inter vivos trusts created by the testator was not to be a part of the value of the estate of which Hospital was to receive one-tenth; (2) that the provision in the codicil that within Hospital's one-tenth should be the appraised value of the corpus of inter vivos trust No. 34365, of which Hospital was remainderman, meant the full value of the corpus rather than the present value of the remainder interest; (3) that the appraised value of a particular asset, the Monte Vista Ranch (the ranch), for purposes of sale, was the correct value to use in computing the total value of the estate for the purpose of Hospital's bequest; (4) that real property taxes accruing after testator's death were deductible from the total value of the estate in determining the amount of Hospital's bequest.
Hospital also takes issue with the making of findings by the trial court.
Bank finds fault with the trial court's decision insofar as it held (1) that $1,000,000 paid to Hospital in a preliminary distribution was to be applied first to payment of interest on the legacy, and the balance on account *571 of principal; (2) that certain expenses were not deductible from the total value of the estate in determining the amount of Hospital's legacy.
Without reciting in detail the findings made by the trial court, they generally expressed interpretations of the will and applications of law to undisputed facts contrary to the contentions made respectively by Hospital and Bank on appeal.
Testator was survived by a brother; a sister; the issue of two predeceased brothers; a daughter, Madeleine Sharp Healy (Madeleine), her issue; the widow of his son, Donald, and their daughter Diane.
In his will, testator referred to his brother and sister, their descendants and the descendants of his predeceased brothers as the "Australian family"; to his own descendants and his son's widow as the "American family."
Donald was reported killed during World War II, in the shooting down of an American bomber over Germany.
In a drive to raise funds for a hospital, testator was solicited for a gift. He deposited one-half million dollars in a trust to be paid to Hospital when a like amount had been raised from other sources. It may be inferred the trust agreement required that the name Donald L. Sharp be a part of the name of Hospital and that a plaque in memory of Donald and commemorating the gift be placed in the hospital lobby, the wording and form to be that of the testator.
Thereafter testator, during his lifetime, made various gifts to Hospital, of $44,000 in 1956; $125 in 1957; and $60,409.96 in 1958.
From the will it appears that the possibility his son Donald might still be alive was ever present in the mind of the testator. The fingerprints of the son were preserved so there could be no successful imposture of the son. If the son were alive and trust No. 40680 were not in existence, the son was to receive one-half of the residue in one contingency, and two-thirds of it in another, and if there were no other descendant of the testator living and no member of the Australian family living, the son was to take all the residue; in a parallel situation, if it were the daughter rather than the son who survived, she would take all, and the Australian family would take all in default of all living lawful descendants of the testator.
The chief objects of the testator's concern were those to whom he was related in blood. Included therein were children and other descendants of a deceased brother, the names and whereabouts of whom were unknown to him when he wrote his will.
Hospital was named as a contingent residuary of his estate but only in *572 the event that trust No. 40680 was not in existence and that there were no living lawful descendant of the testator nor any living member of the Australian family comprising his brothers and sister, whether living or dead, and their lawful descendants.
We are not concerned, of course, with what the testator would have been likely to do based upon his probable preferences in the way of beneficiaries. We are solely concerned with his intention as actually expressed in the language used in the will.
The crux of the controversy is what was intended by the testator when, with regard to the legacy to Hospital, in the codicil he stated it should be "such an amount as shall be equal to one-tenth (1/10th) of the value" of that portion of his estate remaining after the deduction of certain expenses; what he meant by the word "value" when he defined it as "the appraised value for inheritance tax or estate purposes"; what was his intention as to the deductions to be made in reaching the remainder, of which Hospital should receive one-tenth; and whether he intended that the value of the estate for the purpose of Hospital's bequest should include the value of the corpora of certain revocable inter vivos trusts.
The paramount rule in the construction of wills, to which all other rules must yield, is that a will is to be construed according to the intention of the testator as expressed therein, and this intention must be given effect as far as possible. (Estate of Wilson, 184 Cal. 63, 66-67 [193 P. 581]; Estate of Russell, 69 Cal.2d 200, 205 [70 Cal. Rptr. 561, 444 P.2d 353].)
We can only determine what the testator had in mind from the language used in the will as interpreted according to rules for the interpretation of written instruments.
The interpretation of a written instrument, even though it involves what might properly be called questions of fact (see Thayer, Preliminary Treatise on Evidence, pp. 202-204), is essentially a judicial function to be exercised according to the generally accepted canons of interpretation so that the purposes of the instrument may be given effect. (See Civ. Code, §§ 1635-1661; Code Civ. Proc., §§ 1856-1866; Parsons v. Bristol Development Co., 62 Cal.2d 861, 865 [44 Cal. Rptr. 767, 402 P.2d 839].)
Extrinsic evidence is admissible to interpret the instrument, but not to give it a meaning to which it is not reasonably susceptible (Coast Bank v. Minderhout, 61 Cal.2d 311, 315 [38 Cal. Rptr. 505, 392 P.2d 265]; Nofziger v. Holman, 61 Cal.2d 526, 528 [39 Cal. Rptr. 384, 393 P.2d 696]; Imbach v. Schultz, 58 Cal.2d 858, 860 [27 Cal. Rptr. 160, 377 P.2d 172]). and it is the instrument itself that must be given effect. (Parsons v. Bristol Development Co., supra, 62 Cal.2d 861, 865.)
*573 In order to determine initially whether the terms of any written instrument are clear, definite and free from ambiguity, the court must examine the instrument in the light of the circumstances surrounding its execution so as to ascertain what the parties meant by the words used. Only then can it be determined whether the seemingly clear language of the instrument is in fact ambiguous. (Estate of Russell, supra, 69 Cal.2d 200.)
It is therefore solely a judicial function to interpret a written instrument unless the interpretation turns upon the credibility of extrinsic evidence. (Parsons v. Bristol Development Co., supra, 62 Cal.2d 861, 865.)
We are bound also by rules governing the function of an appellate court in reviewing the interpretation placed upon a written instrument by a trial court. Accordingly, an appellate court is not bound by a construction of a contract based solely upon the terms of the written instrument without the aid of evidence, where there is no conflict in the evidence, or a determination has been made upon incompetent evidence. (Parsons v. Bristol Development Co., supra, 62 Cal.2d 861, 865.)
An appellate court must determine that the trial court's interpretation is erroneous before it may properly reverse a judgment. (Parsons v. Bristol Development Co., supra, 62 Cal.2d 861, 866; Estate of Somermeier, 15 Cal. App.3d 224, 234 [92 Cal. Rptr. 872].)
The oral and written evidence presented was not such as to throw light upon the meaning of the language used by the testator in his will and codicil. If it might be said the evidence was intended to bear upon the meaning of the language of the will and codicil, none of the testimony depended for its effect upon the credibility of the witnesses.
In that respect it may be said there was no issue of fact that called for the making of findings. The findings made should be considered merely an explication of the reasons for the trial judge's decision, or in a few instances as a recital of the evidence.
(1) Hospital has taken the position that the value of the trust assets in all the revocable trusts existing at the date of testator's death were a part of "that portion of my estate which shall remain prior to the deduction of any and all State and/or Federal death or inheritance taxes."[2]
*574 The claim is based upon the fact that such trust assets were subject to state inheritance and federal estate taxes and were appraised for such purposes, when considered with the definition of value contained in section 6 of article three of the will, as follows: "The term `value' or `valuation' as used in this Will means the appraised value for inheritance tax or estate purposes."
In Estate of Anthony, 230 Cal. App.2d 766 [41 Cal. Rptr. 317], the court held a bequest of 20 percent of the testator's estate was to be reckoned on the sum of his probate estate and that portion of his gross taxable estate held in a trust. The court reached that conclusion because to have held that the testator used the word estate as limited by his probate estate would have reduced the bequest to less than that of a specific bequest of $45,000 in an earlier will, in the face of a clear indication in the will that the testator wished to increase the earlier bequest to as much as $100,000, and because the testator had by the will exercised a power of appointment he had reserved to himself over the trust estate.
In none of the inter vivos trusts created by the testator here was a power to appoint by will reserved.
In the case at bench there is no such compelling argument to overturn the definition of estate given by the will itself. One-tenth of the estate over which the testator had the power of disposition by will greatly exceeded the bequest of $50,000 as given by the original will.
Throughout his will and in the codicil the testator emphasized numerous distinctions between the trusts and the estate subject to testamentary disposition.
*575 Section 5 of article three defined "entire estate" as follows: "The sum total of all property ... of every kind and nature of which I shall die possessed and over which I shall have the power of disposition by Will at the time of my death, no matter wheresoever the said property shall be located, shall constitute and is herein referred to as my `Entire Estate.'"
Similar language is used in defining his "Canadian Estate," his "Australian Estate" and his "American Estate" (§§ 2, 3 and 4, art. five).
It is clear that the testator did not consider the assets of inter vivos trusts as property over which he had the power of disposition by will.[3]
Some indication of intention with regard to the inclusion of the value of trust assets as a part of the dividend of which Hospital was to receive one-tenth may be found in the explicitness with which the testator directed that all death taxes on revocable inter vivos trusts were to be paid from his American estate, and with which he directed the application to the quotient payable to Hospital of the value of the corpus of the trust of which Hospital was remainderman, while failing to say that the value of those or any other trust assets was to be one of the figures entering into the sum of that dividend.
(2) The language of the codicil is clear and unambiguous that the "appraised value of the Corpus of Trust No. 34365" was to be deemed a part of the one-tenth of the portion of the estate bequeathed to Hospital. It may not reasonably be said that the present value of Hospital's remainder *576 interest was the appraised value of the corpus. The trial court's ruling in that respect was correct.
The single most valuable asset was the ranch, a tract of some 3,000 acres in San Diego County.
The ranch was appraised as of the date of death for $10,246,000 by the inheritance tax appraiser first appointed in 1960. As found by the trial court, the executor in the federal estate tax return put a valuation of $7,000,000 on the ranch as of November 29, 1960. An amended appraisal by a successor appraiser was filed September 25, 1961, giving it a date-of-death value of $8,500,000. A reappraisal for purposes of sale was filed November 3, 1965, which gave a value of $5,100,000, for which amount the court confirmed the sale of the ranch.
Smaller parcels had previously been carved out and disposed of for a total of $190,400, each parcel having been separately reappraised.
(3) As found by the trial court, the value of the ranch for federal estate tax purposes was determined by agreement between Title and the Internal Revenue Service to be $5,290,400; and in the computation of California inheritance taxes a special deduction equal to the difference between the amended appraised value of $8,500,000 and the total of the sales prices of $5,290,400 was allowed under Revenue and Taxation Code section 13988 and section 13988, subdivision (e) of the Inheritance Tax Regulations.
The trial court adopted as the value of the ranch the total of the appraisals made for purposes of sale.
Hospital contends that the value of $8,500,000 given by the amended appraisal of 1961 was the proper one, rather than any of the other appraisals, including the original one of $10,246,000.
The trial court reasoned that the appraisal required to be made in order to sell the ranch was for "estate purposes" and the value fixed thereby came within the will's definition of value.
While the starting point in arriving at the amount to be divided in favor of Hospital was "the value," meaning "the appraised value for inheritance tax or estate purposes," no reason appears from a reading of the will for tying that value to the value for inheritance tax purposes rather than to value for another estate purpose. The starting point of value was a value undiminished by inheritance tax.
It may be said with certainty that the testator intended determination of the value of his estate was not to be the subject of controversy between *577 the conflicting opinions of experts in the service of clients seeking to further their respective interests.
It does not clearly appear that he thought there would be a single appraisal in the course of administration, since he listed "appraisers' fees" as included in "Probate and Administration Expenses."
He did not intend that Hospital should receive a fixed amount which it was within his power to have provided, nor an amount limited by a maximum except as that maximum might be conditioned by circumstances beyond his control at the time of his death and thereafter.
He did not intend the legacy to Hospital to be a percentage of his undiminished gross estate subject to his testamentary disposition.
Hospital has argued that the policy of the law is furthered by its interpretation that the appraised value for California inheritance tax purposes is to be taken in determining the value of the estate. The policy contended for is that underlying Probate Code sections 162 and 162.5 and the policy favoring the early settlement of estates. Since under those statutes a general pecuniary legatee is allowed 4 percent interest on his bequest annually commencing with the first anniversary of testator's death to compensate such a legatee for the income accruing to the residuary from the use of general estate assets (In re Williams, 112 Cal. 521, 524-525 [44 P. 808]); to protect the residuary from payment of excessive interest it is necessary to determine the amount of general legacies as soon as possible; if appraised values for tax purposes are used for their computation, the policy is implemented; if their computation must await the sale of assets, the policy is defeated.
Hospital maintains also it should not be in the position of having its bequest determined by the executor, who could elect to sell one asset over another, thereby determining the value of the estate and substituting his intent for that of the testator; that Hospital's bequest has been determined to be of a specific sum, not an amount that will fluctuate with every turn of the market.
Estate of Sharp, 257 Cal. App.2d 851, 855 [65 Cal. Rptr. 438], specifically did not decide testator intended to give Hospital a legacy of a specific sum of money.[4]
The will indicates the intention of the testator that the bequest was *578 not of a specific sum and that the amount thereof would be determined by circumstances that he could not control or predict with certainty.
No issue was raised that the administration of the estate was not by generally accepted reasonable probate practice. The trial court's ruling that the amount of Hospital's bequest was to be reduced by a proportionate share of administration expense then undetermined implies a finding that the administration of the estate was in the course of such accepted reassonable probate practice; it does not imply unreasonable delay on the part of the executor. The law requires only that the executor proceed without unreasonable delay. (Estate of Germond, 4 Cal.3d 573, 580 [94 Cal. Rptr. 153, 483 P.2d 769].)
So far as the time element may have entered into the contemplation of testator, he will be assumed to have contemplated an administration in the usual course of reasonable probate practice considering the size and complexity of the estate.
Until the extent of the administration expense was ascertainable in at least an approximation, the amount of Hospital's bequest could not have been ascertained.
The appraised value of the ranch for sale purposes was for estate purposes. In that respect the trial court's interpretation of the will as permitting the using of such appraised value was a reasonable one. We do not see that it was erroneous.
(4a) In declaring of what part of his estate he made the bequest of one-tenth to Hospital, the testator's language was as follows: "... that portion of my estate which shall remain prior to the deduction of any and all State and/or Federal death or inheritance taxes, but after the deduction of Probate and Administration expenses of my said estate, including proper debts, attorneys' fees, executors' fees, accountants' fees appraisers' fees, court costs, etc."
His use of the phrase "Probate and Administration expenses of my said estate" implied more than the words "expenses of probate and administration" sometimes might imply, because he stated that "proper debts" were included therein, along with "attorneys' fees, executors' fees, accountants' fees, appraisers' fees, court costs, etc."
In declaring in his will what was to be distributed under the residuary clause, he said in section 1 of article twelve it was what remained:
"[a]fter the payment of:
"(a) All debts and liabilities of my Entire Estate; and
*579 "(b) All expenses of operation, if there shall be operation of any part of my Estate; and
"(c) All death and other taxes properly chargeable against my Entire Estate under the law or under this Will; and
"(d) All bequests and legacies as provided for in this Will; and
"(e) All expenses of probate and other proceedings; and
"(f) All Executor's fees in accordance with the attached letters of agreement relating to Executor's fees; and
"(g) All Attorney's fees in accordance with the attached letters of agreement relating to Attorney's fees; and
"(h) All other proper charges, if any, incurred in connection with my Entire Estate ..."
The testator in one respect treated the bequest to Hospital in the codicil in a different manner than other preferred bequests. He provided in section 1 of article eleven of the will that all bequests should be paid without any reduction for death taxes and expenses of administration. The codicil bequest to Hospital, however, was to be calculated only after payment of administration and other expenses. It is not important that the provision of the will was only that which would have resulted by operation of law. (Prob. Code. § 750.) Such, also, would have been the result as to the codicil bequest but for the fact the testator had specifically provided otherwise.
The language used in the codicil in making the portion of the estate of which Hospital was to receive one-tenth chargeable with debts and expenses of administration, to which legacies other than residuary legacies are not subjected by law where assets otherwise are sufficient (Prob. Code, § 750), lessened the priority to which a general legacy is entitled.
In section 1 of article twelve of the will the testator mentioned "all expenses of probate," made no mention of "administration expenses"; mentioned "all debts and liabilities of my Entire Estate" and made separate mention of debts, executor's and attorneys' fees as distinct from expenses of probate.
He made specific mention of death and other taxes.
In the codicil provision he excluded from the items to be deducted "all State and/or Federal death or inheritance taxes"; did not exclude property taxes.
In the codicil formula for determining the dividend from which Hospital *580 was to receive its legacy, he used the phrase "Probate and Administration expenses of my said estate" and language that included within that description "proper debts, attorneys' fees, executors' fees, accountants' fees, appraisers' fees, court costs, etc."
Since he used the phrase "etc." only once in either will or codicil, he did not specify in full detail the deductions that were to be made in ascertaining the amount of that dividend. On the other hand, he did specify the charges that were not to be deducted, i.e., "any and all State and/or Federal death or inheritance taxes."
(5) The phrase "etc.," if it can be given reasonable meaning, should not be considered surplusage and meaningless. (Soule v. Northern Construction Co., 33 Cal. App. 300, 302 [165 P. 21]; Hanford Mercantile Store v. Sowlveere, 11 Cal. App. 261 [104 P. 708].)
If it can reasonably be done, the phrase should be given its ordinary meaning: correlated matters, or others of like character; things within the rule of ejusdem generis. (Hanford Mercantile Store v. Sowlveere, supra, 11 Cal. App. 261, 263.)
(4b) The phrase "etc." reasonably may be interpreted to refer to the charges of like character set out in another part of the will defining the part of the estate to be distributed under the residuary clause.
Probate Code section 950 declares the priorities for payment of charges against the estate. Expenses of administration come first; after funeral expenses, expenses of last illness, family allowance, debts having priority under federal law, wages for services rendered before death of the decedent, mortgage and other liens to the extent of the security, judgments rendered during the life of the decedent, come all other demands against the estate.
The expenses entitled to first priority in payment are expenses of administration. In that sense any expense entitled to first priority in payment is an expense of administration.[5]
Any charges, if necessary and proper to preserve the estate, come under *581 the head of expenses of administration. (Gurnee v. Maloney, 38 Cal. 85, 87.)
The question has arisen not infrequently as to the priority if any to which the expenses of preserving the property of the estate are entitled. The authorities favor the view that such expenses are entitled to first priority, in general without describing them as expenses of administration. (Quigley v. Nash,[6] 1 Cal.2d 502, 506-507 [36 P.2d 112]; Estate of Hughes,[7] 3 Cal. App.2d 551, 553 [40 P.2d 295]; Enscoe v. Fletcher,[8] 1 Cal.App 659 [82 P. 1075], overruled on other grounds in Tabata v. Murane, 24 Cal.2d 221, 231 [148 P.2d 605].)
This court has properly held that the codicil bequest to Hospital was a general bequest and not a residuary bequest. (Estate of Sharp, supra, 257 Cal. App.2d 851 [65 Cal. Rptr. 438].)
The will and codicil may reasonably be interpreted to mean, however, that in calculating the amount of the bequest it was to be reckoned upon only that portion of the value of the estate that remained after the payment of all the items that are mentioned in the quoted portion of section 1 of article twelve of the will except death taxes and other bequests.
While the bequest is not the bequest of a part of the residue, the only consistently reasonable interpretation is that the testator intended the general pecuniary legacy to be one-tenth of the value of the principal of what would constitute the residue of his estate before estate and inheritance taxes and other bequests were paid therefrom, after deducting all charges properly payable from such principal in the administration of the estate.
The trial court properly held that real and personal property taxes *582 assessed during the course of administration were expenses of administration within the meaning of the codicil.
(6) Real property taxes that become due during the course of administration are properly payable by the executor in the care and management of the estate. (Estate of O'Connor, 200 Cal. 646, 650 [254 P. 269].)
The same is true as to taxes upon personal property of the estate. (County of Los Angeles v. Morrison, 15 Cal.2d 368, 372-373 [101 P.2d 470, 129 A.L.R. 443]; San Francisco v. Pennie, 93 Cal. 465, 471 [29 P. 66].)
In County of Los Angeles v. Morrison, supra, 15 Cal.2d 368, 372, the court declared:
"[A]n executor of a will or an administrator of an estate has authority and it is his duty to preserve the property by paying taxes which have been legally imposed."
(4c) Such taxes are and must be distinguished from taxes chargeable against a business operation and which are assessed only because of the carrying on of the business. (See Estate of Morris, 37 Cal. App.2d 155 [99 P.2d 294]; Estate of Allen, 42 Cal. App.2d 346, 350 [108 P.2d 973].)
In re Trinity Tractor Co., 3 Cal. App.3d 428, 444 [83 Cal. Rptr. 783], is not authority for the proposition that property taxes are not an expense of administration of a probate estate, since it dealt with the dissolution of a corporation. Even there the taxing authority was held to have by statute a prior claim, the court saying the county's contention the taxes were entitled to priority as administration expenses was immaterial because the claim for taxes was entitled to a priority by statute.
Part of the taxes held deductible here were upon realty devised to Hospital. The rule declared in Estate of A. Mogan, Myrick 80, that the devisee of real property has the duty of paying taxes thereon that are assessed after the death of the testator, no longer holds in California (Estate of O'Connor, supra, 200 Cal. 646); but payment of those taxes might perhaps be said to have been for the benefit of Hospital.
The major part of the taxes paid was upon the ranch. Hospital argues the taxes were a part of the expense of operation of a business. The ranch had been put to some use for farming operations. In addition it produced income from 10 rental units thereon. In fact farming operations were not carried on there after March of 1960 in which the first of the taxes were to become a lien following the testator's death.
*583 A crop of oats growing when testator died on November 29, 1959 was worthless. In March 1960 the executor sold all the farming equipment, machinery and livestock. Thereafter the executor let the grazing rights of the ranch lands. Total income from the ranch until it was sold was $77,127.98. The expenses, other than real property taxes, were $57,410.62, which included wages of a caretaker, amounting to $21,600.
The income from the ranch up to the time of sale exceeded expenses by only $19,718.60, taxes not being included among expenses. Those taxes totaled $584,100.88.
Since the executor seems to have paid the taxes out of income, and, no doubt, claimed deductions therefor in income tax returns, income taxes were thereby reduced, to the benefit of the residuary.
The taxes against the ranch, to the extent the income from the ranch exceeded the expenses thereof, other than taxes, should have been paid from such income and the amount of such excess income should be deducted from the total of taxes paid before the amount of such taxes is fixed as a deductible item in computing the dividend of which Hospital is to receive a tenth.
If there might appear to be equitable reasons why the real property taxes paid should be charged to the residuary, it yet remains that the intention of the testator when discovered should prevail.
There is no reason why state or federal income tax upon income of the estate during the course of administration should be deducted from the principal of the estate of which Hospital was to receive a part. Such income taxes properly were payable from the income upon which they were based.
The same is true as to any interest paid upon such income taxes or delinquency assessments. It does not appear that any such interest accrued because of a lack of cash with which to pay the taxes. The executor made a loan of $250,000 to Hospital during the course of administration, thus evidencing that the analogy of borrowing to pay income taxes and paying interest on the money borrowed seems inappropriate.
The costs of sale of the various parcels of real property, being an expense entitled to first priority, were expenses of administration within the meaning of the codicil.
The expenses of the caretaker of the ranch were more than covered by the income from the ranch, and, being related to the production of income, were properly paid from such income and are not deductible *584 from the principal of the estate in determining the amount of Hospital's bequest.
Inheritance and estate taxes were to be paid out of the residue remaining after Hospital's bequest and other bequests were paid or set aside for payment. That residue is also the fund from which any interest on such taxes should be paid.
(7a) The trial court held that a payment made June 30, 1967, to Bank of $1,000,000 ordered distributed by an order made June 2, 1967, "in partial satisfaction of the legacy mentioned in Section (1) of Item Two of the codicil," should be applied first to interest on the legacy at the rate of 4 percent per annum from the first anniversary date of the testator's death and the balance applied in partial satisfaction of such bequest.
Bank's position is that the payment should have been applied to reduce the principal amount of the legacy which pro tanto would then cease to bear interest.
The decree appealed from fixed for the first time the gross amount of the bequest to Hospital, deducted therefrom the appraised value of the realty devised to Hospital, and the appraised value of the corpus of the inter vivos trust of which Hospital was the remainder beneficiary, and an undetermined one-tenth of administration expenses that might have been or might be paid after April 21, 1969.
The net amount of the bequest, subject however to deduction for a share of such additional expenses of administration, was found to be $1,162,109.44.
Hospital now argues that the correct way of dealing with the question was to calculate interest on the net bequest from the first anniversary date to the second anniversary date of the testator's death. At that point any such interest unpaid would be added to and become a part of the principal bequest upon which interest would accrue, and so on each successive anniversary date there would be a fresh addition of unpaid interest to the interest-bearing principal.
Hospital argues that would not be allowing interest on interest, and would not result in compound interest, because, it states: "[T]he general rule does not preclude interest on an accretion to principal."
(8) It is true that interest is said always to be an accretion to or increment to the principal fund earning it, and unless lawfully separated therefrom becomes a part thereof. (Pomona City School Dist. v. Payne, 9 Cal. App.2d 510, 516 [50 P.2d 822].)
*585 However, the adding of interest to the principal on which it is charged or earned and then paying interest on that sum is to compound interest and pay interest on interest. (Finger v. McCaughey, 114 Cal. 64, 66 [45 P. 1004]; Page v. Williams, 54 Cal. 562, 564; State of California v. Day, 76 Cal. App.2d 536 [173 P.2d 399].)
(9) Interest may not be computed on accrued interest unless by special statutory provision or by stiplation of the parties (State of California v. Day, supra, 76 Cal. App.2d 536, 554), although when a judgment is rendered which awards interest the full amount of the judgment will bear interest at the statutory rate from the date of entry. (Boscus v. Bohlig, 173 Cal. 687 [162 P. 100].)
(7b) The authorities upon which Hospital relies are Phraner v. Stone, 137 N.J. Eq. 284 [44 A.2d 504, 509], First Nat. Bank & Trust Co. v. Baker, 124 Conn. 577 [1 A.2d 283], and Whiteside v. Washington Loan & Trust Co., 95 F.2d 83 [68 App.D.C. 172].
The New Jersey case is cited in support of a text citation from 69 C.J. 1273, section 2671, to this effect: "`The interest is to be computed and paid on the amount or value of the legacy as ascertained. Where partial payments have been made on a legacy, the amount due to the legatee is to be ascertained by making annual rests, adding the interest each year to the principal, and deducting the payments made during the year, the residue being a new principal, provided, of course, this mode of computation does not result in allowing compound interest.'" (Phraner v. Stone, 137 N.J. Eq. 284 [44 A.2d 504, 509].)
Neither the quoted rule from Corpus Juris, the decision of the Supreme Court upon which it is based (Story v. Livingston,[9] 38 U.S. (13 Pet.) 359, 371 [10 L.Ed. 200, 206], nor the three cases cited, lend support to Hospital's theory that unpaid interest is to become a part of the principal which will earn interest until paid.
Estate of Luckel, 151 Cal. App.2d 481, 490-491 [312 P.2d 24], cited by Hospital, does not support the proposition that interest accrued on an annuity in a fixed amount monthly would itself bear interest. In Luckel the court, relying upon Probate Code section 162, held annuities commence at the testator's death, are due at the end of the period for which they are ordered paid, and bear interest at 4 percent per annum on the amount of any unpaid accumulations held by the executor on each anniversary of the decedent's death, computed from the date of such anniversary. *586 It was further held interest on payments accruing during administration inures to the benefit of the annuitant and is payable upon distribution.
We have examined cases in which interest was payable on a legacy, an annuity or a beneficial interest in a trust; in none of which was compound interest mentioned as proper. (In re Mackay, 107 Cal. 303 [40 P. 558]; Estate of Platt, 21 Cal.2d 343, 350 [131 P.2d 825]; Estate of Hill, 54 Cal.2d 39 [4 Cal. Rptr. 1, 351 P.2d 33]; Estate of Miller, 259 Cal. App.2d 536, 544 [66 Cal. Rptr. 756]; Estate of Moore, 219 Cal. App.2d 737 [33 Cal. Rptr. 427]; Estate of Fitzgerald, 62 Cal. App. 744, 752 [217 P. 773]; Estate of Schiffmann, 86 Cal. App.2d 638 [195 P.2d 484]; Estate of Schaetzel, 44 Cal. App.2d 320 [112 P.2d 324].)
In Dunne v. Dunne, 66 Cal. 157 [4 P. 441, 1152], it was expressly held that the legacies were to bear simple interest only.
We reject any procedure by which unpaid accrued interest would itself bear interest.
Hospital states the procedure adopted by the trial court was in accordance with Civil Code section 1479 which provides that where a debtor, under several obligations to another, does an act by way of performance, in whole or in part, which is equally applicable to two or more obligations, such performance must be applied first to the extinction of interest due at the time of performance, if the debtor has not manifested to the creditor the intention or desire to apply it otherwise and the creditor in the absence of such manifestation has not applied it otherwise.
Since the principal amount was first ascertained on July 11, 1969, as the amount to bear interest from November 29, 1960, it is not reasonable to say there was any interest due at the time of the payment on account of the legacy or to say that a payment made in partial satisfaction of the legacy on June 30, 1967, should be applied retroactively to interest the amount of which was determined two years later.
The application of the payment of $1,000,000 should have been made at the time of payment. The amount of the payment was such that it might be considered either a recognition that the legacy would amount to at least $1,000,000, or, if it be thought the judge who ordered the payment intended it to apply in part to interest, as a recognition that the principal payment would be such an amount as would with interest at 4 percent per annum thereon from November 29, 1960, amount to $1,000,000. Regarded in the light most favorable to Hospital, the interest on that amount of principal would be the greatest amount of interest to be charged against the payment of $1,000,000.
*587 In passing upon the question whether the first distribution of $1,000,000 should have been applied first to interest accrued at the time of payment, consideration may be given to general rules as to when interest becomes due.
(10) Where the rate of interest is fixed at a certain per centum per annum, the same is payable at the time of maturity of the principal obligation. (Hollywood etc. School Dist. v. Keyes, 12 Cal. App. 172, 174 [107 P. 129]; Frye v. Shepherd, 173 Mo. App. 200 [158 S.W. 717]; First Nat. Bank v. Kirby (Mo.) 175 S.W. 926.)
(11) In the absence of an agreement to the contrary, interest is payable only when the principal becomes due. (Gibbs v. Mendoza, 103 Cal. App. 183, 186 [284 P. 250].) That is also true where the agreement is that the interest, if not paid quarterly, is to be compounded quarterly and added to the principal. (Avery v. Hagenios, 45 Cal. App. 176, 179 [187 P. 119].)
The rule that in general interest on a claim the amount of which is undetermined or unliquidated is not allowed prior to judgment can have no application here (Perry v. Magneson, 207 Cal. 617, 622-623 [279 P. 650]; Conderback, Inc. v. Standard Oil Co., 239 Cal. App.2d 664, 689-690 [48 Cal. Rptr. 901]) because here the payment of interest on the unliquidated amount is provided by statute. However, the rule deserves consideration for such light as it may throw on the question at what time the interest on the legacy became due.
Estate of Hubbell, 216 Cal. 574, 579-580 [15 P.2d 503], in which there had been a partial distribution of one-half the amount of certain legacies, held interest should be allowed on one-half of the respective legacies for the period elapsing between one year after the testator's death and the date of payment, and on the remaining half of the respective legacies for the period elapsing between one year after the testator's death and the date of payment under the final decree of distribution.
In Estate of Fitzgerald, supra, 62 Cal. App. 744, 752, the court said: "[T]he value of the disposable property of the estate, one-third of which may be given to charitable uses, must be fixed as of the time of distribution because that is the time when the allowed claims against the estate, and costs of administration, have been determined and the amount of the residuum has become fixed. But it is equally true that for the same reason that is also the time when the amount of interest due can be ascertained. We agree with counsel for the residuary legatee in his contention that the right to interest is derived from the statute and not from the will."
(7c) We hold that where statutory interest is to be allowed on a legacy *588 which is unliquidated as to amount, the interest does not become due until the amount of the legacy has been determined, and that any partial distribution made prior to the determination of the principal amount of the legacy is to be applied and credited at the time of payment in reduction of the amount of principal.
The judgment is reversed insofar as it is at variance with the views expressed herein; in all other respects it is affirmed. The case is remanded to the trial court with instructions to enter judgment in accordance with the views expressed herein.
Brown (Gerald), P.J., and Coughlin, J., concurred.
A petition for a rehearing was denied July 26, 1971, and appellants' petition for a hearing by the Supreme Court was denied September 22, 1971.
NOTES
[1] Estate of Sharp, 257 Cal. App.2d 851 [65 Cal. Rptr. 438].
[2] The following revocable trusts were among those created by the testator:

Trust No. 34365, referred to in the codicil, was created by the testator on May 29, 1941, and was amended on several occasions, the last being in May 1955. Except for amount directed to be paid to one Lillian V. Fuller during her lifetime, the entire trust income was reserved to testator during his life. After testator's death, all income was to be paid to Lillian V. Fuller and the trustee was empowered to invade the corpus for her need. Upon the death of Lillian V. Fuller, the trust was to terminate and the remainder to be paid to Hospital. Lillian V. Fuller's life estate in the trust was appraised for inheritance tax purposes at $151,632.83, and Hospital's remainder was appraised at $257,600.53. Total value of the corpus was $409,233.36.
Trust No. 40680 was established November 27, 1950. It was revocable and Bank was named as trustee. Income was payable to testator during his lifetime and thereafter was payable to various family members. The corpus was appraised for federal estate tax purposes at a date-of-death value of $1,340,704.18.
Trust No. 43928 was established July 12, 1955, and Bank was its trustee. Income was payable to testator during his lifetime and thereafter to testator's daughter-in-law and her husband and, after their deaths, to their issue. The corpus was appraised for tax purposes at $198,888.00.
Trust No. 2649 was established November 16, 1950, with Canada Permanent Trust Company as trustee. Income was reserved to testator during his lifetime and was thereafter payable to certain relatives of testator. The corpus was appraised for tax purposes at $851,405.75.
Trust No. P-14475, of which Title was also trustee, was created April 30, 1955. The primary asset was a residence directed to be maintained for the use of Lillian V. Fuller. Surplus income earned by other trust assets was reserved to testator for life and was thereafter to be accumulated by Title and paid, upon the death of the survivor of testator and Lillian V. Fuller, into the residue of testator's testamentary estate. The appraised date-of-death value of the corpus was $232,063.11.
[3] For example: "By reason of the said Trusts my said daughter has been adequately provided for. Therefore, I make no direct provision herein for my said daughter." (§ 2 of art. five.)

The codicil made certain of its bequests subject to conditions that were declared in one of the trusts as conditions for enjoyment of the trust benefits.
"Under a certain Trust Agreement executed by me, as TRUSTOR, under date of July 12, 1955; and accepted by CONTINENTAL ILLINOIS NATIONAL BANK AND TRUST COMPANY OF CHICAGO, as TRUSTEE, under date of August 12, 1955; I have named FRANK L. COOK and CLAIRE B. COOK, husband and wife, now residing at 4767 Mission Bell Lane, La Mesa, California, and their lawful descendants, as beneficiaries of the said Trust, subject to the restrictions and prohibitions set forth in the said Trust Agreement. The said Trust is designated in the records of the Trustee as `Trust under Agreement No. 43928' and is revocable.
"In the event that the said Trust No. 43928 shall still be in existence at the time of my death, I hereby give and bequeath to the following named persons the amount hereinafter set forth in this Section (10) opposite their respective names: PROVIDED that each such bequest is hereby made upon the following conditions:
"(a) That at the time for the distribution of such bequest, such person shall be living; and
"(b) That such person shall not have been, and shall not at the time for the distribution of such bequest, be in violation of any of the restrictions or prohibitions of the hereinbefore described Trust Instrument ..."
[4] "Assuming, without deciding, distribution under the instant legacy is subject to conditions precedent and the recipient or the amount thereof is not determinable until distribution, we conclude, nevertheless, the contention in question is without merit." (Estate of Sharp, 257 Cal. App.2d 851, 855 [65 Cal. Rptr. 438].)
[5] The application of that principle might be seen in the case of a decedent's estate the only asset of which was a parcel of real property.

Before the payment of funeral expenses, the item next in priority after expenses of administration, it would be necessary to sell the real property. From the proceeds there would necessarily be paid first the proper expenses of the sale, including broker's fees allowed by the court. If the purchaser's offer was conditioned upon the property's being free of taxes already payable or delinquent, the proceeds would be reduced accordingly before being available for the payment of funeral expenses and claims with less priority.
[6] "The findings are very full regarding all these disputed items. They clearly show that all of these items cover expenditures which were necessary for the preservation of the property of said estate. Had they been made by an administrator regularly appointed to settle the estate, they would, undoubtedly, have been proper charges of administration to be paid in course of administration, without the necessity of any formal claim being presented for their allowance or payment, and before the payment of any general or preferred claim." (Quigley v. Nash, 1 Cal.2d 502, 506-507 [36 P.2d 112].)
[7] "A demand of a real estate agent, employed to sell real property belonging to an estate, is a claim which comes under the head of expense in the care, management and settlement of the estate...." (Estate of Hughes, 3 Cal. App.2d 551, 553 [40 P.2d 295].)
[8] "The $74.50 expended by the administrator for insuring the property of the estate, having been contracted after McNeil's death, is not properly a claim against his estate, yet it is a charge against the estate, being an item of expense incident to preserving the property during the course of administration, and is entitled to payment prior to payment of debts...." (Enscoe v. Fletcher, 1 Cal. App. 659, 666 [82 P. 1075].)
[9] In Story v. Livingston, 38 U.S. (13 Pet.) 359 [10 L.Ed. 200, 206] the question was whether a mortgagee in possession was required to apply rents as collected to accruing interest or to hold the rents to the end of the year and then apply them. This rule was declared for the benefit of the debtor.